## <u>AFFIDAVIT OF TASK FORCE OFFICER SCOTT ALICEA-BAILEY</u>

I, Task Force Officer ("TFO") Scott Alicea-Bailey, being duly sworn, hereby depose and state under oath:

### Introduction and Agent Background

1.      I have been employed by the Southbridge Police Department for over 20 years, where I have served as a Detective for the past 14 years. I am a graduate of the full-time Municipal Police Academy in Boylston, Massachusetts. In addition to this training and the annual in-service training that I attend, I have received approximately 600 hours of specialized training in drug enforcement sponsored at both the municipal and federal levels, to include a two-week Basic Narcotics course sponsored by the Massachusetts Criminal Justice Training Council.

2.      In March 2015, I was assigned as a Task Force Officer (TFO) to the Tactical Diversion Squad (TDS) of the Drug Enforcement Agency (DEA) stationed in Worcester, Massachusetts. The primary mission of TDS is the enforcement laws prohibiting the trafficking of diverted pharmaceutical drugs and chemicals. As a DEA TFO, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General

3.      I have participated in numerous federal drug trafficking investigations of individuals engaged in the illegal distribution of controlled dangerous substances. In addition, I have been involved in the execution of numerous search and seizure warrants, made arrests for violations of state and federal laws, and authored supporting affidavits. Furthermore, I have participated in the investigation of numerous drug trafficking conspiracies and cases involving the use of court authorized disclosure of location data relating to cellular telephones.

4.      In connection with my work as a TFO with the DEA, I have worked with federal, state, and local law enforcement officers in the District of Massachusetts. These diverse personnel provide the DEA with an extensive breadth of experience and knowledge about illegal drug trafficking in the District of Massachusetts and elsewhere, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846.

5.      I am familiar with the manner in which narcotics traffickers use vehicle to transport and distribute narcotics and the proceeds of narcotics trafficking. From my training and experience, I am aware that drug traffickers often transport drugs and drug proceeds in motor vehicles, and that drug traffickers often use motor vehicles to meet with coconspirators, including their sources of supply and/or their drug customers.  Experienced drug traffickers will often engage in counter-surveillance maneuvers while driving a vehicle in an attempt both to determine whether they are being followed by law enforcement and to disrupt any surveillance activities being conducted by law enforcement.

7.      More broadly, based upon my training and experience, tracking drug traffickers in motor vehicles frequently leads to evidence of narcotics and money laundering offenses, including but not limited to (a) identification of potential criminal associates, such as criminal coconspirators, suppliers of illegal narcotics, and money launderers; (b) identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; (c) identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions, and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

## PURPOSE OF AFFIDAVIT

8.      I submit this affidavit in support of applications pursuant to Federal Rule of Criminal Procedure 41 for four warrants authorizing the search of: (1) Apartment #2R, i.e. the second floor rear apartment, at 104 Ridge Street, Providence, Rhode Island (the "Subject Premises"); (2) the blue 2023 Nissan Murano bearing Rhode Island registration GO571 and Vehicle Identification Number 5N1AZ2CSXPC123179 (the "Subject Vehicle"); (3) the person of Brandon JONES (born 1988); and (4) the person of Adria MELLO (born 1991).  The locations to be searched are more fully described in Attachments A-1, A-2, A-3 and A-4, respectively.

9.      As described herein, there is probable cause to believe that the Subject Premises, the Subject Vehicle, and the persons of JONES and MELLO will contain: evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime, namely possession with intent to distribute, and distribute, controlled substances, in violation of 21 U.S.C. § 841(a) and conspiracy to do the same, in violation of 21 U.S.C. § 846 (collectively the "Subject Offenses").

10.     The items to be searched for and seized are described in more detail in Attachment B, and specifically include evidence maintained in electronic format on a mobile telephone found in the Subject Premises, the Subject Vehicle, or on the persons of JONES or MELLO.  The methods by which any mobile telephones will be searched are more fully set forth in the "Seizure of Cell Phones" section of this affidavit.  The items to be seized constitute evidence, contraband, or fruits of the Subject Offenses.

11.     The statements in this affidavit are based upon my investigation as well as information provided by other law enforcement officers.  Since I submit this affidavit for the limited purpose of securing the requested warrants, I have not included every fact known to me

concerning this investigation but, instead, have set forth only those facts that I believe are necessary to establish the required probable cause for issuance of the requested warrants.

## FACTS ESTABLISHING PROBABLE CAUSE

### Oxycodone Sales to the Undercover Officer

1.      Initiation of the Investigation and Observations of JONES's Activity

12.      During the course of this investigation, agents[1] have learned that JONES and others, both known and unknown, have established an Oxycodone and cocaine drug trafficking organization in and around Worcester, Massachusetts, and have distributed significant quantities of Oxycodone and cocaine in that area since January 2020.

13.      In July 2022, I, along with Southbridge Police detectives, spoke with a confidential source (the "CS")[2] regarding drug trafficking activities of a male subject the CS knew as "Skip."  During subsequent investigation, "Skip" was positively identified as JONES. According to the CS, JONES resides in Providence and distributes Oxycodone and cocaine in the Worcester area.  The CS advised that, on a daily basis, JONES travels to Worcester in rental vehicles, sells his product in that area throughout the afternoon, and then returns to his residence in Providence.  The CS stated that JONES frequently changes rental vehicles but has utilized the same cellphone number – ████-7120 – for the past few years.  According to the CS, JONES was driving a newer model red Ford Escape at that time.

---

[1] Unless otherwise specified, the term "agents" refers generally to DEA Special Agents, DEA Task Force Officers, and other state and local law enforcement officers participating in this investigation.

[2] The CS was previously arrested for possession of controlled substances.  The CS has not yet been charged for that possession and has agreed to cooperate in this investigation in hopes of avoiding criminal charges for that conduct.  To date, the information provided by the CS has been corroborated by agents through surveillance and has proven accurate.

14. On July 17, 2022, agents established surveillance in the area of Park Avenue in Worcester and observed JONES operating a rented 2022 red Ford Escape.[3]  JONES met with multiple people in the Park Avenue area.  In general, these meetings consisted of JONES parking on the street or in a parking lot, unknown subjects exiting from nearby vehicles, and either approaching the driver side window of the rental vehicle or entering the passenger side of JONES's vehicle. The meetings lasted less than a minute, and the unknown subjects would walk away from JONES' vehicle, returning to their vehicle and leaving the area.  Agents observed approximately five of these short interactions within a thirty-minute period.

15. One such interaction involved a male later identified as "K.K."[4]  JONES parked his vehicle on Abbot Street.  Agents observed K.K. arrive in the area, exit his vehicle, and enter JONES's vehicle. After a short period, K.K. exited JONES' vehicle, re-entered his vehicle and then drove from the area.  Agents followed and stopped K.K., who admitted that he had just purchased approximately 26 grams of suspected cocaine from JONES on Abbot Street.

B.    September 14, 2022, Oxycodone Sale to the Undercover Officer

16. On or about September 14, 2022, a Southbridge, Massachusetts Police Detective, acting in an undercover capacity (the "UC"), contacted JONES at phone number ██████-7120 and arranged for the purchase of $700 worth of Oxycodone pills.

20. On September 14, 2022, agents met with the UC and provided him with $700 for the purchase.  Agents observed a rented white Nissan Altima[5] parked in the driveway of

---

[3] The Ford Escape is owned by PV Holding Corp, d/b/a Avis Car Rental ("Avis") and was rented by Adria MELLO, who lives at the Subject Premises and is believed to be JONES's girlfriend.

[4] I am aware of "K.K.'s" full identity and date of birth.  According to K.K.'s Massachusetts criminal history, in 2021, K.K. was charged with possession of cocaine.  K.K. admitted sufficient facts and the matter was continued without a finding.

[5] MELLO rented the Nissan Altima from Avis on or about August 31, 2022.

JONES's residence at 104 Ridge Street.  The Altima exited the driveway of 104 Ridge Street at approximately 12:19 pm but agents were unable to maintain constant surveillance.

21.     Jones directed the UC to meet him at Winfield Street in Worcester.  Shortly after the UC's arrival, agents observed JONES's Nissan Altima arrive on Winfield Street and park near the UC.  The UC entered the Nissan's front passenger seat and exchanged $700 for 23 suspected Oxycodone pills.  The UC exited the Nissan, re-entered his vehicle and drove directly to a meet location where he provided me with the suspected Oxycodone pills.  Agents later field-tested two of the 23 pills, with a positive result for the presence of oxycodone.

C.     October 05, 2022, Oxycodone Sale to the UC

22.     On or about October 5, 2022, the UC contacted JONES at (508) 410-7120 and arranged for the purchase of $1,000 worth of Oxycodone pills.

23.     On October 5, 2022, agents met with the UC and provided him with $1,000 for the purchase.  Agents observed a rented blue Nissan Altima[6] parked in the driveway of 104 Ridge Street.  At approximately 11:54 am, JONES exited 104 Ridge Street, entered the Nissan, and drove from the area.

24.     At approximately 1:58 pm, the UC proceeded to Winfield Street, Worcester, as directed by JONES.  At approximately 2:41 pm, JONES contacted the UC and re-directed the UC to the Walmart on Tobias Boland Way.  At approximately 4:11pm, surveillance observed the Nissan enter the Walmart parking lot and park near the UC vehicle.  The UC entered the rear seat of JONES's vehicle.[7]  An unidentified male also entered the rear seat of JONES's vehicle shortly after the UC entered.

---

[6] MELLO rented the Nissan Altima from Avis on or about September 21, 2022.

[7] The UC carried a recording device; however, that device malfunctioned and no recording of the meeting was obtained

25.    According to the UC, after he entered JONES's car, he and JONES exchanged the $1,000 for 32 Oxycodone pills.  The unidentified male then gave an unknown amount of currency to JONES for Oxycodone pills. The UC exited the Nissan, re-entered his vehicle and drove directly to a meet location where he provided me with the 32 suspected Oxycodone pills. Two of the pills were later field-tested with a positive result for the presence of oxycodone.

C.    November 22, 2022, Oxycodone Sale to the UC

26.    On or about November 22, 2022, the UC again contacted JONES at (508) 410-7120 and arranged for the purchase of Oxycodone pills.

27.    On November 22, 2022, agents met with the UC and provided him with $1,500 for the purchase.  Agents observed a rented Kia K5 bearing MA Reg 3GNJ77[8] parked in the driveway of 104 Ridge Street.  At approximately 9:02 am, a female with a small child exited the area of 104 Ridge Street, entered the Kia, and left the area.  At approximately 12:38 pm, the Kia returned to 104 Ridge Street and parked in the driveway.  A female, believed to be MELLO, exited the car and entered 104 Ridge Street through a first-floor door on the right side of the building.

29.    At approximately 1:00pm, surveillance observed the Kia K5, operated by a male later confirmed to be JONES, exited the driveway and leave the area.  Agents were unable to maintain constant surveillance due to JONES's driving habits, including excessive speeding and unannounced lane changes.

30.    At approximately 1:45 pm, agents located the Kia in Massachusetts near the Millbury Street exit off Route 146.  JONES drove to Whipple Street in Worcester and parked on the side of the road.  Agents observed a small red vehicle occupied by an unidentified male also

---

[8]  Mello rented the Kia K5 from Avis on or about November 2, 2022.

parked in the area. The male exited his vehicle and entered the passenger side of JONES's vehicle. After a short interaction, the male exited JONES's vehicle, re-entered his vehicle and left the area.

31.     At approximately 2:55 pm, the UC contacted JONES, who directed the UC to Chelsea Street. At approximately 3:10 pm, the UC parked on Chelsea Street and informed JONES that he had arrived. JONES advised the UC that he would be at the spot in "5 minutes." At approximately 3:28pm, JONES arrived in the area in the Kia and parked in front of the UC vehicle. The UC exited his vehicle and entered into the front passenger seat of the Kia.[9]

32.     JONES advised the UC that he only had 15 "M's" with him and would have to go to his house to pick up more.[10] JONES provided the 15 pills to the UC in exchange for $420. The UC then told JONES he was looking for a new supplier of crack cocaine. JONES offered to provide crack cocaine at a price of $30/gram for an ounce or more, and a "ball" – 3.5 grams of cocaine – for $115.

33.     During the post-buy meeting, the UC confirmed that he purchased 15 pills from JONES on Chelsea Street. Examination of the 15 pills revealed that 14 were marked with "M" and one pill was marked with "ALG 265". Agents field-tested one of the 14 pills marked with the "M" and the one pill marked with "ALG 265" and obtained positive results for the presence of oxycodone.

E.     January 4, 2023, Oxycodone Sale to the UC

34.     On or about January 4, 2023, the UC contacted JONES at ███████-7120 and arranged for the purchase of Oxycodone pills.

---

[9] The meeting between the UC and JONES in the Kia was audio-recorded.

[10] The UC previously had advised JONES that he preferred the Oxycodone pills marked with an "M" because they "sell faster."

35.     On January 4, 2023, investigators provided the UC with $1,500 for the expected purchase.  At approximately 10:48 am, investigators observed a rented Toyota Camry[11] enter the driveway at 104 Ridge Street.  At approximately 12:41 pm, the Camry –operated by JONES – exited the driveway and left the area.

36.     Agents maintained surveillance as JONES drove from Providence to 10 Whipple Street in Worcester and parked in the driveway.  An unidentified white male exited a gray Honda Pilot[12] and entered JONES's vehicle.  After a short period, the male exited JONES's vehicle, returned to Honda and departed.  JONES also drove from the area.

37.     The UC contacted JONES at ███████-7120 and advised that he was in Worcester.  JONES directed the UC to Fern Street, where the UC arrived at approximately 2:08 pm.  JONES arrived approximately two minutes later and parked near the UC's vehicle.  The UC exited his vehicle and entered the front passenger seat of JONES's Camry.[13]

38.     According to the UC, upon entering JONES's vehicle, he observed JONES receive two phone calls during which he appeared to set up drug sales in the area. After completing those calls, JONES retrieved a plastic bag from his pocket that contained an estimated 500 blue pills.  The UC advised JONES that he had $1,500.   JONES informed the UC that he would sell him 50 pills.  JONES counted out approximately 50 pills, placed the pills into the second plastic bag, and then provided the second bag to the UC.  The UC then asked JONES about the possibility of buying a firearm.  JONES advised the UC that he could get the UC a

---

[11] The Toyota Camry is owned by Avis.

[12] The Honda Pilot was parked on Whipple Street prior to JONES's arrival.  I am aware of the license plate number and registered female owner of the Pilot but have omitted that information for privacy reasons.

[13] The UC carried a recording device; however, that device malfunctioned and no recording of the meeting was obtained.

firearm "Asap."  The UC told JONES he needed a couple days to get the money together. The UC then exited JONES's vehicle.

39.    Agents met with the UC, who provided agents with the bag of pills that JONES sold to him.  A count of the pills revealed that the bag only contained 48 pills, each marked with "M 30."  Agents field-tested two pills and obtained a positive result for the presence of Oxycodone.

### Travel to New Jersey and New York

F.    February 8, 2023 Travel to Garfield, New Jersey

40.    On three occasions between February 6, 2023 and March 6, 2023, the Court issued orders authorizing agents to install GPS tracking devices on vehicles rented and used by MELLO and JONES.[14]  The location data obtained from those GPS devices, coupled with physical surveillance, revealed frequent travel to New Jersey and New York.  Specifically, according to data obtained from the GPS tracker:

41.    On Wednesday, February 9, 2023, the 2022 Toyota Rav4 rented by MELLO departed Ridge Street, Providence at approximately 10:34 pm and drove directly to Wood Street in Garfield, New Jersey, arriving at 1:47am on February 10, 2023.[15]  After only approximately 44 minutes, the Rav4 drove directly back to Providence, arriving at approximately 5:51 am.

42.    On February 18, 2023, the 2019 Chevrolet Equinox rented by MELLO departed Ridge Street at approximately 4:56 am, and traveled to Wood Street in Garfield, New Jersey, arriving at approximately 8:21 am.  After approximately 65 minutes, the Equinox departed Wood Street and returned directly to Providence, arriving at approximately 12:28 pm.  At

---

[14] See 23-SW-018 LDA, 23-SW-040 PAS, and 23-SW-68 PAS.

[15] According to Google maps, Wood Street, in Garfield, New Jersey is approximately 189 miles from Ridge Street, in Providence.

approximately 12:54 pm, the Equinox departed Providence and traveled to Worcester, and proceeded to make frequent, short stops in the Park Avenue area.  Agents did not conduct any physical surveillance that day.

43.     On February 21, 2023, the Equinox departed Ridge Street at approximately 5:15 am and arrived at Wood Street in Garfield, New Jersey at approximately 8:50 am.  Agents observed MELLO operating the vehicle with no other adults in the car.  MELLO exited the Equinox, removed an infant car seat from the back seat of the vehicle, and entered ▮ Wood Street.  After less than an hour, at approximately 9:46 am, MELLO exited ▮ Wood Street carrying the infant car seat, returned to the Equinox, and drove from the area. At approximately 12:42 pm, agents observed the Equinox arrive and park at 104 Ridge Street.  MELLO exited the vehicle, retrieved the infant car seat and entered 104 Ridge Street.  Just 17 minutes later, at approximately 12:59 pm, the Equinox drove from 104 Ridge Street with JONES operating the vehicle.

44.     On February 25, 2023, the Equinox departed Ridge Street at approximately 5:38 am.  At approximately 8:23 am, the Equinox arrived in Garfield, New Jersey and parked at the intersection of Wood Street and Plauderville Avenue.  An hour later, at approximately 9:22 am, agents observed MELLO exit ▮ Wood Street carrying an infant car seat and walk to the Equinox. MELLO drove from New Jersey to 104 Ridge Street, arriving at approximately 12:36 pm.  At approximately 1:00 pm, JONES left 104 Ridge Street in the Equinox and drove to Worcester, where agents observed him engage in multiple brief encounters consistent with street level drug dealing.

45.     On March 6, 2023, the Court authorized installation of a GPS tracking device on the Subject Vehicle, rented by MELLO from Avis Rental.

46.     On March 9, 2023, the Subject Vehicle departed Ridge Street at approximately 9:03 pm and drove to the area of 4100 East Tremont Avenue, Bronx, New York, arriving at approximately 11:30 pm.  At approximately 12:10 am, agents observed the Subject Vehicle parked across East Tremont Street from Bridges Bar.  At approximately 12:34 am, a gray Acura MDX bearing New York registration KBZ8017 arrived at Bridges Bar.  A male passenger exited the Acura and entered the bar.  Within two minutes, JONES (carrying no items) and the male exited the bar and entered the waiting Acura.  The Acura completed a U-turn, drove past the parked Subject Vehicle, stopped, and then backed up to the area of the Subject Vehicle.  JONES exited the Acura carrying a small backpack and entered the Subject Vehicle.  The Subject Vehicle departed the area, arrived back in Providence at approximately 6:08 am (stopping at a restaurant for two minutes) and returned to the Ridge Street area at approximately 6:19 am.

47.     On Monday, March 13 at approximately 7:57 am, the GPS data obtained from the Subject Vehicle indicated that the car was on Route I-95 heading southbound.

48.     In my training and experience, the frequent early morning travel by MELLO and/or JONES from Providence, Rhode Island to New Jersey or New York, with relatively brief stops at that location, before returning to Providence, Rhode Island is consistent with the acquisition of narcotics in New Jersey or New York with the intent to distribute those narcotics, including in Worcester, Massachusetts.

   A.     Information Regarding the Subject Premises

49.     104 Ridge Street is a three-level, multi-unit building, yellow in color with a red-front entrance door.  To the left of the door affixed to the building is the number "104" and what appear to be five mailboxes.  There is off-street space for parking in front of the building, as well as a driveway that runs along the left side of the building.  To the right of the building is a walkway

that leads to a side entrance.  Based on their investigation to date – including their observations on November 22, 2022 (paragraph 27 above) – agents believe the Subject Premises can be accessed through the side entrance.

50.     According to Massachusetts Registry of Motor Vehicle ("RMV") records, JONES has an active Massachusetts driver's license with a residential address of ███Lakewood Street Apartment ██, Worcester, Massachusetts.  However, the "primary contact address" listed in the RMV records is 104 Ridge Street, Apt 2R, Providence, RI 02909, i.e. the Subject Premises.

51.     MELLO maintains a Rhode Island driver's license with a residential address and primary contact address of 104 Ridge Street, Apt. 2R, Providence, RI 02909.

52.     Further, on May 18, 2017, after a narcotics investigation focused on JONES and MELLO, Rhode Island State Police executed a search warrant at the Subject Premises.  Based on the relevant State Police report, JONES and MELLO were taken into custody in Massachusetts as part of the investigation and, therefore, were not present at the Subject Premises.  Upon execution of the warrant at the Subject Premises, investigators located a digital scale, drug packaging material, paperwork in the name of JONES and MELLO, and a false wall with hidden compartment in a bedroom closet.

B.     Information Regarding Those Involved in Drug Distribution

53.     Based on my training and experience, and conversations with other law enforcement officers who investigate narcotics offenses, I know the following:

     a.  Drug distribution is a cash business, and drug dealers often transact in large sums of money, and are in the possession of or have ready access to large amounts of money;

     b.  Because drugs are often bought and sold on credit, dealers frequently maintain written or electronic records of the drugs bought and sold, the identities of the persons who have purchased or sold the drugs, and the moneys due to, or

owed, by them.  In the case of electronic records, drug dealers commonly maintain these records such as mobile phones;

c.  Drug dealers often hide their distribution records, controlled substances, and drug proceeds, on their person, in their residences, in the residences of persons involved with them in the distribution of controlled substances, in their places of business, in their vehicles, and in bank safe deposit boxes, safes, and other secure storage areas to which they have access;

d.  Drug dealers utilize various paraphernalia, such as scales, cutting agents (diluents) and packaging materials such as plastic sandwich baggies, to prepare and package these controlled substances for further distribution.  Such paraphernalia are often stored in close proximity to where the controlled substances are stored, such as in the cars and residences of distributors, and on their persons; and

e.  Drug dealers often utilize "hides" in their vehicles, businesses, and homes.  These hides are built in such a way that they blend in with the car's original interior or exterior and can be opened manually or electronically by manipulating several different electronic devices in the vehicle. Some are also opened with the use of magnets.  In the homes and businesses, the hides are built into the floors, walls, and furniture.

## SEIZURE OF CELL PHONES

54.  Based on my knowledge, training, and experience, I know that electronic data can be recovered months or years after it has been created, downloaded, saved, deleted, or viewed over the internet because:

a.  Electronic files can be stored for years at little or no cost.

b.  When a person "deletes" a file on a smartphone, the data contained in the file does not actually disappear; rather, that data remains until it is overwritten by new data, which might not occur for long periods of time.  In addition, a smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Virtual memory paging systems can leave traces of information that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

55.  Information stored on a smartphone provides crucial evidence of the "who, what,

why, when, where, and how" of the criminal conduct under investigation.  In my training and experience, information stored on a smartphone (*e.g.*, communications, images and movies, transactional information, internet history, location information) can indicate who has used or controlled the phone, or the physical location of other user.

56.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in mobile phones, including smartphones, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that the phones be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because:

      a.     There can be a large volume of data.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

      b.     Analyzing mobile phone evidence is a highly technical process requiring expertise and a properly controlled environment.  The array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.

57.     Consequently, law enforcement agents request authorization to either copy the data the premises to be searched or seize the telephone for later processing elsewhere.

58.     The premises may contain mobile phones, including smartphones, whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Phones can be disguised, mislabeled, or used without the owner's knowledge.  In addition,

technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.

59.     The law enforcement agents will endeavor to search and seize only the mobile phones which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in the respective Attachments B because they are associated with (that is used by or belong to) JONES and/or MELLO.  If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular mobile phone, the law enforcement agents will seize and search that mobile phone pursuant to the probable cause established herein.

60.     This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any Government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the Government, attorney support staff, and technical experts.  Pursuant to this warrant, the law enforcement agents may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the Government and their support staff for their independent review.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

61.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

62.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

63.     The passcode that would unlock the Apple device(s) found during the search of the Subject Premises, if any, is not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of the Apple device(s) found during the search of the Subject Premises to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The Government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

64.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in

whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Subject Premises to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

65.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of JONES and MELLO, and any other individuals found at the Subject Premises to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## CONCLUSION

66.     Based on the information described above, I have probable cause to believe that:

    a.     JONES and MELLO have committed the Subject Offenses;

    b.     The Subject Premises, the Subject Vehicle and the persons of JONES and MELLO, and mobile phones, found in the Subject Premises, Subject Vehicle, or on JONES's or MELLO's person, that reasonably appear to law enforcement to belong to or be used by JONES's or MELLO, as further set forth in Attachments A-1, A-2, A-3, and A-4, contain evidence, fruits, and instrumentalities of the Subject Offenses as set forth in the respective Attachments B.

I declare that the foregoing is true and correct.


I declare that the foregoing is true and correct,


_____
Scott D. Alicea-Bailey
Task Force Officer
Drug Enforcement Administration


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___Telephone_____
                                    (specify reliable electronic means)

March 13, 2023                      _____
_____                    Judge's signature
Date

**Providence RI**                  _____
_____                    Magistrate Judge Lincoln D. Almond
City and State

## ATTACHMENT A-1

### Apartment #2R, 104 Ridge Street, Providence, Rhode Island

The Subject Premises is Apartment 2R, 104 Ridge Street, Providence, Rhode Island (the "Subject Premises"). 104 Ridge Street is a three-level, multi-unit building, yellow in color with a red-front entrance door. To the left of the door affixed to the building is the number "104" and what appear to be five mailboxes. There is off-street space for parking in front of the building, as well as a driveway that runs along the left side of the building. To the right of the building is a walkway that leads to a side entrance.

The Subject Premises is located on the second floor of the building, towards the rear of the property. Photographs of 104 Ridge Street are included below:



Front Entrance of 104 Ridge Street



Walkway to right and side entrance

## ATTACHMENT B

I.   All records, in whatever form, and tangible objects that constitute evidence, fruits, or
     instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of controlled
     substances) and 21 U.S.C. § 846 (conspiracy to distribute controlled substances),
     including:

    a.   Controlled substances, including oxycodone and cocaine;

    b.   Any material used to cut, dilute, or otherwise adulterate controlled substances.

    c.   Items and objects utilized in the packaging or distribution of controlled
        substances, including bags, scales, and sealing devices or materials;

    d.   Any and all cash, currency, and records (whether in documentary or electronic
        format) relating to the receipt, transfer, storage, or use of proceeds from the
        distribution of controlled substances or the expenses relating to acquisition or
        distribution of controlled substances, including ledgers, books, notes, and money
        orders;

    e.   Any firearms or ammunition;

    f.   Any and all communications (whether in documentary or electronic format) sent
        or received since  that relate to the acquisition, storage, transportation, or
        distribution of any controlled substance, or that relate to the receipt, transfer,
        storage, or use of proceeds from narcotics distribution or the expenses relating to
        narcotics acquisition or distribution, and any and all records relating to or
        referencing such communications;

    g.   Any and all records (whether in documentary or electronic format), books, logs,
        receipts, notes, ledgers, or data relating to the acquisition, storage, transportation,
        or distribution of any controlled substances;

II.  Records and tangible objects relating to:

    a.   the occupancy, control, or use of the residence located at 104 Ridge Street,
        Apartment 2R, Providence, Rhode Island

III. Any cellular telephone(s) that are found in the possession of Brandon JONES or Adria
     MELLO, found among their personal items or that agents establish during the execution
     of the search warrants are used by JONES or MELLO and all names, words, telephone
     numbers, email addresses, time/date information, messages or other electronic data
     relating to or referencing drug trafficking and/or referencing individuals engaged in drug
     trafficking located in the memory of these cellular telephone(s), including but not limited
     to:

1

a.  Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.  Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.  Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d.  Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e.  GPS data;

f.  Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.  Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.  All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.  Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

2

## <u>APPLE TOUCH ID AND BIOMETRICS</u>

During the execution of the search of the cellular telephones, law enforcement personnel are authorized to press the fingers (including thumbs) of JONES or MELLO to the Touch ID sensor of the iPhone OR hold the devices in front of the faces of JONES or MELLO for the purpose of attempting to unlock the device(s) via Touch ID / Face ID in order to search the contents as authorized by this warrant.

## <u>RETURN OF SEIZED COMPUTER EQUIPMENT</u>

If the owner of the seized cellular telephones requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized cellular telephones, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If cellular telephones cannot be returned, agents will make available to the cellular telephones' owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all cellular telephones seized pursuant to this warrant for as long as is necessary for authentication purposes.

3